Baltimore City Board of Elections, et al. v. Mayor and City Council of Baltimore, et al., No. 34, September Term, 2023

**CHARTER AMENDMENTS – CONSTRUCTION OF CHARTERS – LOCAL LEGISLATION – POLICE AND GENERAL POWERS** – Supreme Court of Maryland held that when proposed charter amendment precludes City's meaningful exercise of discretion to legislate in area under the ambit of Article XI-A, § 3 of Constitution of Maryland and encroaches upon City's police or general welfare power, it does more than amend form or structure of government originally established by adoption of charter and is therefore not proper "charter material." For these reasons, Supreme Court concluded that proposed charter amendment known as Baby Bonus Amendment that would have mandated one-time payment of at least $1,000 to every eligible City resident upon birth or adoption of child violated Article XI-A, § 3 of Constitution of Maryland.

Supreme Court of Maryland declined to overrule Cheeks v. Cedlair Corp., 287 Md. 595, 608-09, 415 A.2d 255, 262 (1980), in which Court held that proposed citizen-initiated amendment was not "charter material" given that when "[c]onsidered as a whole, the amendment [was] not addressed to the form or structure of government in any fundamental sense[,]" and that "[t]o permit the voters by charter amendment, to exercise the City's police or general welfare powers would constitute an unlawful extension or enlargement of the City's limited grant of express powers and would violate the constitutional requirement that those powers be exercised by ordinance enacted by the City Council." (Footnote omitted). Supreme Court concluded that overruling Cheeks would allow charter amendment process to be used to enact local laws in contravention of Constitution of Maryland.

Supreme Court of Maryland declined to sever mandatory payment provision from Baby Bonus Amendment, concluding that dominant purpose of Amendment would not be achieved in absence of $1,000 payment provision, which abrogated City's law-making authority in violation of Constitution of Maryland.

Circuit Court for Baltimore City
Case No. C-24-CV-24-001320

Argued: August 28, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 34

September Term, 2023

_____

BALTIMORE CITY BOARD OF
ELECTIONS, ET AL.

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE, ET AL.

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Opinion by Watts, J.

_____

Filed:  February 3, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Childhood poverty is a national crisis that demands attention from citizens, lawmakers, and businesses alike. In Baltimore City, this reality is impossible to ignore, as it has been reported that over 20% of children in the city live in extreme poverty, a rate significantly higher than the national average and twice that of Maryland overall. See A Profile of Youth and Young Adults in Baltimore, *The Annie E. Casey Foundation* (Sep. 14, 2024), https://www.aecf.org/blog/a-profile-of-youth-and-young-adults-in-baltimore [https://perma.cc/NF2F-UBUC]. Growing up in a poverty-stricken community increases the likelihood that children may suffer violence and experience food and housing insecurity—factors which contribute to making the prospect of social mobility an elusive goal for many.

In a well-intentioned effort to mitigate childhood poverty, the Maryland Child Alliance, Inc. ("the Alliance"), Appellant, sponsored a petition proposing an amendment to the Charter of Baltimore City, a document which is the functional equivalent of a state or federal constitution. The proposed amendment would have required payments of at least $1,000 to all new parents who are residents of the City and is known as the "Baby Bonus Amendment." In Maryland, a charter amendment may be proposed by a resolution of the Mayor and City Council of Baltimore City or by the Council of a County. See Md. Const., Art. XI-A, § 5. In addition, a charter amendment may be proposed by a petition signed by at least 20% of the registered voters of the City or of a County, or 10,000 registered voters, whichever is fewer, see id., and, under those circumstances, would be referred to as a "citizen-initiated" amendment.

In this instance, after obtaining signatures of registered voters, the Alliance

requested that the Baltimore City Board of Elections ("Baltimore City BOE") include a question regarding the citizen-initiated Baby Bonus Amendment on the ballot for the November 2024 Presidential General Election. Ultimately, the Baltimore City BOE determined that the Alliance's petition contained sufficient voter signatures and certified the Baby Bonus Amendment for placement as a question on the ballot for the November General Election.

In the Circuit Court for Baltimore City, the Mayor and City Council of Baltimore, Michael Mocksten, the Director of the Department of Finance of Baltimore City, and Robert Cenname, the Deputy Director of the Department of Finance of Baltimore City (together, "the City"), Appellees, sued the Baltimore City BOE, Scherod C. Barnes, the President of the Baltimore City BOE, and Armstead B.C. Jones, Sr., the Election Director of the Baltimore City BOE (together, "the City Board"), Appellants, as well as the State Board of Elections ("the State Board"), Appellee. The City sought judicial review of the City Board's certification of the question, a writ of mandamus compelling the City Board to perform its statutory duties, declaratory judgment, and an injunction keeping the Baby Bonus Amendment off the ballot.

The Alliance filed a motion to intervene as a defendant, which the circuit court granted. The City filed a motion for summary judgment; the City Board filed a motion to dismiss or for summary judgment; and the Alliance filed a motion to dismiss and conditional cross-motion for summary judgment. On August 9, 2024, in a memorandum opinion and order, the circuit court declared that the Baby Bonus Amendment violated Article XI-A, § 3 of the Constitution of Maryland, ruling that it took away any meaningful

discretion from the City over an area within its legislative purview and that the amendment was in fact legislative in nature rather than proper charter material.

Pursuant to Md. Code Ann., Elec. Law (2003, 2022 Repl. Vol.) ("EL") §§ 6-209(a)(3)(ii) and 6-210(e)(3)(i)(2), the City Board and the Alliance each noted a direct appeal to this Court. On August 28, 2024, this Court heard oral argument and, on August 29, 2024, issued a *per curiam* order affirming the circuit court's ruling. See Balt. City Bd. of Elections v. Mayor and City Council of Balt., 488 Md. 531, 533, 322 A.3d 77, 78 (2024) (per curiam).

Accordingly, the Baby Bonus Amendment was not presented as a question on the ballot for the November 2024 Presidential General Election. We now explain the basis for our August 29, 2024 order.

## BACKGROUND

### The Proposed Baby Bonus Amendment

In February 2023, pursuant to EL § 6-202, the Alliance submitted to the Baltimore City BOE a draft petition for the proposed Baby Bonus Amendment, seeking an advance determination as to the format of the petition. After several revisions, on March 1, 2023, the Baltimore City BOE notified the Alliance that the petition was sufficient as to format but advised that a determination as to the legality of the proposed amendment would be made at the time the petition and requisite signatures were filed. Thereafter, over a period of approximately 15 months, the Alliance collected almost 14,000 signatures from Baltimore City voters in support of the proposed Baby Bonus Amendment.

On July 1, 2024, after validating more than 10,000 signatures, pursuant to EL § 6-

208(c), the Baltimore City BOE certified that the Baby Bonus Amendment petition satisfied all requirements established by law related to the petition and qualified for placement as a proposed charter amendment on the ballot for the November 2024 Presidential General Election. The proposed Baby Bonus Amendment would have added the following language as Art. I, § 20 of the Charter of Baltimore City:

a. *Fund established; provision of payments.*

1. There is a continuing, non[-]lapsing Baltimore Baby Bonus Fund, to be used exclusively for the provision of Baby Bonus Payments to residents of Baltimore City.

2. A Baby Bonus Payment is a one-time payment to the birthing parent of a child, upon the birth of a child, unless the conditions in subparagraph (3) or (4) are satisfied.

3. By Ordinance, or by proper delegation of regulatory authority, the Mayor and City Council may set forth conditions in which the guardian of a child other than the birthing parent may receive the Baby Bonus Payment instead of the birthing parent.

4. By Ordinance, or by proper delegation of regulatory authority, the Mayor and City Council may set forth conditions in which an adopting parent or parent(s) may receive a single Baby Bonus Payment upon the adoption of a child.

5. A Baby Bonus Payment shall be at least $1,000.

6. A timely Baby Bonus Payment shall be made to all Baltimore City residents who meet the conditions set forth in subparagraphs (2), (3), or (4).

7. The Fund shall be administered in accordance with the following standards:

   1. [T]o the maximum extent feasible, payments should be made within a reasonable time frame to ensure that parents can use the funds to assist with the costs of raising a newborn child[.]

- 4 -

2. [T]o the maximum extent feasible[,] surplus monies should be used to the purposes set forth in paragraph (a) subparagraph (1).

3. By Ordinance, or by proper delegation of regulatory authority, the Mayor and City Council shall determine the annual Baby Bonus Payment amount using all relevant data, including, but not limited to: surplus monies in the fund, historical birth rates, estimated future property values, etc.

b.    *Revenue Source.*

The Baltimore Baby Bonus Fund shall comprise:

1. A mandatory annual appropriation in the Ordinance of Estimates of an amount equal to at least $0.03 on every $100 of assessed or assessable value of all property in the City of Baltimore (except property exempt by law); and

2. Grants and donations made to the Fund.

c.    *Continuing Nature of the Fund.*

Notwithstanding any other provision of this Charter, unspent portions of the Baltimore Baby Bonus Fund:

1. remain in the Fund, to be used exclusively for its specified purposes;

2. do not revert to the general revenues of the City; and

3. their appropriations do not lapse.

d.    *Implementation.*

By Ordinance, the Mayor and City Council shall provide for the oversight, governance, and administration of the Baltimore Baby Bonus Fund, including:

1. methods and criteria for evaluating parental eligibility;

2. methods and criteria for determining the logistical distribution of the Fund; and

3. the establishment of any other legislative or administrative rules, regulations, or standards, consistent with this section, governing the Fund, its operations, and programs and services funded by it[.]

**Proceedings in the Circuit Court and on Appeal**

On July 11, 2024, in the circuit court, the City sued the City Board and the State Board.[1] The complaint included four counts which sought: (I) judicial review of the City Board's certification of the question for placement on the ballot; (II) a writ of mandamus compelling the Defendants to perform their statutory duties under the Election Law Article; (III) declaratory judgment that the Baby Bonus Amendment is unconstitutional; and (IV) an injunction keeping the Baby Bonus Amendment off the ballot.

On July 12, 2024, the Alliance filed a motion to intervene as a defendant. On July 18, 2024, the circuit court granted the motion. On July 23, 2024, the City filed a motion for summary judgment; the City Board filed a motion to dismiss or for summary judgment; and the Alliance separately filed a motion to dismiss and conditional cross-motion for summary judgment.[2] On August 7, 2024, the circuit court conducted a hearing on the motions.

---

[1]The City also sued Michael G. Summers, the Chair of the State Board, and Jared DeMarinis, the Administrator of Elections of the State Board, neither of whom is a party to this appeal.

[2]Although the State Board is a party to this appeal, in its response to the City's motion for summary judgment, the State Board took "no position on the legality of the proposed charter amendment at issue[,]" and instead simply "urge[d] expediency in adjudicating and resolving this ballot question challenge, so that preparations for the 2024 presidential general election [could] be completed lawfully."

On August 9, 2024, the circuit court issued a memorandum opinion and order in which it granted the City's motion for summary judgment, denied the City Board's motion to dismiss or for summary judgment, and denied the Alliance's motion to dismiss and conditional cross-motion for summary judgment. The circuit court declared that the Baby Bonus Amendment violated Md. Const., Art. XI-A, § 3, under which "[e]very charter . . . shall provide for an elective legislative body in which shall be vested the law-making power of said City or County[,]" and enjoined the Defendants from placing the Baby Bonus Amendment on the ballot for the November 2024 Presidential General Election.

In so ruling, the circuit court addressed a contention by the Alliance that the City lacked standing to bring the action because the City was not "aggrieved" by the determination to place the Baby Bonus Amendment on the ballot. The circuit court found that the City had standing to challenge the certification of the Baby Bonus Amendment because placing the question on the ballot would require the City to draft ballot language and unnecessarily expend funds in support of a proposed amendment that the City alleged to be unconstitutional. The circuit court also determined that, even if the City did not have standing, Mr. Mocksten and Mr. Cenname had standing because, as public officials responsible for administrating the fund, they faced the dilemma of either refusing to put the question on the ballot, or doing so and subsequently learning that the question is unconstitutional.[3]

Addressing the merits, the circuit court found that the Baby Bonus Amendment

---

[3]On appeal, the Alliance did not raise an issue as to the circuit court's ruling on standing.

violated Md. Const., Art. XI-A, § 3 because it "takes away any meaningful discretion from the City to such a degree as to remove control over an area within its legislative purview." The circuit court agreed with the City that, although the Baby Bonus Amendment "provides discretion to the City in the implementation provisions, this discretion is rendered meaningless[,] as the proposal defines who is eligible to receive the bonus, the exact minimum amount [eligible recipients are entitled to], and how it will be financed."

The circuit court concluded that the Baby Bonus Amendment "[was] not addressed to the form or structure of government[,]" "[did] not differ in any material respect from a simple legislative enactment prohibited by Art[.] XI-A, § 3[,]" and "[went] well beyond a mandatory appropriation crossing the line into legislative material prohibited by Art. XI-A, § 3." (Cleaned up). The circuit court distinguished the Baby Bonus Amendment from another Charter provision, Art. I, § 13 (known as the Children and Youth Fund provision) of the Charter of Baltimore City, stating that the Children and Youth Fund provision "leaves discretion to the City to administer the programs and services in accordance with defined standards" and "does not establish a specific payment to residents, the amount of the payment, and define who is eligible to receive such a payment."

On August 12, 2024, the City Board and the Alliance filed notices of appeal. On August 28, 2024, we heard oral argument in the case. On August 29, 2024, in a *per curiam* order, we affirmed the circuit court's August 9, 2024 order and held that "[t]he circuit court correctly determined that the Baby Bonus Amendment violates Article XI-A, § 3, of the Constitution of Maryland because it is not proper 'charter material.'" Balt. City Bd. of Elections, 488 Md. at 533, 322 A.3d at 78 (quoting Cheeks v. Cedlair Corp., 287 Md. 595,

- 8 -

608, 415 A.2d 255, 262 (1980)).

## Standard of Review

Whether a circuit court properly granted a motion for summary judgment is a question of law that an appellate court reviews without deference.  See Bd. of Cnty. Comm'rs of St. Mary's Cnty. v. Aiken, 483 Md. 590, 616, 296 A.3d 933, 948 (2023).  A circuit court's denial of a motion for summary judgment, however, is reviewed for an abuse of discretion.  See Westminster Mgmt., LLC v. Smith, 486 Md. 616, 674 n.34, 312 A.3d 741, 775 n.34 (2024); Dashiell v. Meeks, 396 Md. 149, 165, 913 A.2d 10, 19 (2006).

## DISCUSSION

## Forms of Local Government

"There are three forms of local [] government in Maryland: charter; code [];[] and commissioner[.]" Getty v. Carroll Cnty. Bd. of Elections, 399 Md. 710, 713 n.1, 926 A.2d 216, 218 n.1 (2007) (citations omitted).  These three terms are shorthand for local jurisdictions with charters, local jurisdictions with code home rule, and jurisdictions with the commissioner form of local government, respectively.  See id. at 713 n.1, 926 A.2d at 218 n.1.  In addition to local jurisdictions with code home rule, local jurisdictions with charters are also considered to have home rule, which refers to "[a] state legislative provision or action allocating a measure of autonomy to a local government, conditional on its acceptance of certain terms." *Home Rule*, Black's Law Dictionary (12th ed. 2024).  Counties without home rule are most commonly known as "commissioner count[ies,]" Matter of 2022 Legislative Districting of State, 481 Md. 507, 582, 282 A.3d 147, 192 (2022), though they may also be referred to as "county commissioner counties[,]" Green

v. High Ridge Ass'n, Inc., 346 Md. 65, 67 n.2, 695 A.2d 125, 126 n.2 (1997).

A "charter is equivalent to a constitution." Save Our Streets v. Mitchell, 357 Md. 237, 248, 743 A.2d 748, 754 (1998) (cleaned up). As with a constitution, a charter "provide[s] a broad organizational framework establishing the form and structure of government in pursuance of which the [local jurisdiction] is to be governed and local laws enacted." Id. at 248-49, 743 A.2d at 755 (citation omitted). "[T]he basic function of a charter is to distribute power among the various agencies of government, and between the government and the people who have delegated that power to their government." Id. at 248, 743 A.2d at 754 (cleaned up).

### The Home Rule Amendment and Baltimore City's Charter

Md. Const., Art. XI-A, was ratified by voters in Maryland in 1915 and is commonly known as the "Home Rule Amendment." Cheeks, 287 Md. at 597, 415 A.2d at 256. Art. XI-A was intended to give local jurisdictions the ability to share, "within well-defined limits, powers formerly reserved to the General Assembly" through the adoption of charters. Id. at 597, 415 A.2d at 256; see also Assanah-Carroll v. Law Offices of Edward J. Maher, P.C., 480 Md. 394, 423, 281 A.3d 72, 89 (2022), reconsideration denied (Sept. 26, 2022) (citation omitted).[4]

Art. XI-A, § 1 authorizes a county or Baltimore City to adopt a "charter or form of government" by popular vote. Art. XI-A, § 2 requires that the General Assembly adopt "a

---

[4]Md. Const., Art. XI-F allows local jurisdictions to have home rule by adopting code home rule, and Md. Const., Art. VII governs commissioner counties. See Getty, 399 Md. at 713 n.1, 926 A.2d at 218 n.1.

grant of express powers" for those local jurisdictions adopting a charter and provides that a local jurisdiction may exercise the express powers delegated to it by the General Assembly and that those powers "shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly." Art. XI-A, § 3 requires that each charter "provide for an elective legislative body in which shall be vested the law-making power of said City or County." Art. XI-A, § 3 also provides that, in local jurisdictions that have a charter, the county council, or the Mayor and City Council of Baltimore, "shall have full power to enact local laws of said City or County including the power to repeal or amend local laws of said City or County enacted by the General Assembly, upon all matters covered by the express powers granted" under Art. XI-A, § 2.

In short, under Md. Const., Art. XI-A, § 3, in a local jurisdiction governed by charter, only the local legislature may enact local laws, *i.e.*, legislation. A charter itself cannot consist of provisions that would amount to citizen-initiated legislation, as that would be tantamount to a charter containing legislation that was enacted by voters rather than by the local legislature. See Save Our Streets, 357 Md. at 249-50, 743 A.2d at 755. The prohibition against a charter containing legislation extends not only to the initial adoption of a charter, but also to a charter amendment. See id. at 249-50, 743 A.2d at 755.

Baltimore City is among the local jurisdictions with charters. See Charter of Balt.

City.[5]  In Baltimore City, the local legislature is the City Council of Baltimore.  See Md. Const., Art. XI-A, § 3.  Md. Const., Art. XI-A, § 5 outlines the procedural requirements that must be met in order to propose an amendment to the Charter of Baltimore City or the charter of a county.  Charter amendments may be proposed by resolution of the Mayor of Baltimore and the City Council of Baltimore or the Council of a County, or by a petition signed by at least 20% of the City's or a County's registered voters, or 10,000 voters, whichever is fewer, and filed with the Mayor of Baltimore or President of the County Council.  See id.

A proposed amendment shall be submitted to the voters of Baltimore City or the County at the next Congressional or Presidential General Election occurring after the corresponding petition has been filed.  See id.  If a majority of votes are cast in favor of the proposed amendment, the amendment becomes part of the Charter of Baltimore City or the respective County "from and after the thirtieth day after said election."  Id.

Baltimore City's earliest charter was enacted in 1898 by Ch. 123 of the Acts of 1898.  See Cheeks, 287 Md. at 599, 415 A.2d at 257.  The express powers granted to the City by the General Assembly in the 1898 charter were codified as Article 4, Section 6 of

---

[5]Of Maryland's 24 local jurisdictions, including Baltimore City, half have charters, a quarter are code counties, and another quarter are commissioner counties.  See Md. State Archives, Local Government (Mar. 11, 2022), https://msa.maryland.gov/msa/ mdmanual/01glance/html/county.html [https://perma.cc/EB6L-DCZH].  The 11 charter counties are Anne Arundel, Baltimore, Cecil, Dorchester, Frederick, Harford, Howard, Montgomery, Prince George's, Talbot, and Wicomico Counties.  See id.  The 6 code counties are Allegany, Caroline, Charles, Kent, Queen Anne's, and Worcester.  See id.  The 6 commissioner counties are Calvert, Carroll, Garrett, St. Mary's, Somerset, and Washington Counties.  See id.

the Public Local Laws of Maryland.  See id. at 600, 415 A.2d at 257.  Article 4, Section 6 granted the City "full power and authority" to "pass ordinances exercising within the limits of the City of Baltimore all the power commonly known as the Police Power to the same extent as the State has or could exercise said power within said limits[,]" and ordinances "maintaining the peace, good government, health and welfare of the City of Baltimore." Id. at 600, 415 A.2d at 257 (cleaned up).  In 1918, the voters of Baltimore City adopted a charter that superseded the 1898 Charter.  See id. at 599, 415 A.2d at 257.

In 1918, the General Assembly also adopted the Express Powers Act, granting express powers to counties that adopted a charter under Art. XI-A.  See id. at 600 n.2, 415 A.2d at 257 n.2.  In 1920, in Chapter 555 of the Acts of 1920, the General Assembly expressly provided the voters of Baltimore City the power as set forth in Art. XI-A, § 6 to make changes described in sections 1 through 6 of Art. XI of the Constitution but provided "that nothing in this section [] shall be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said City . . . as set forth in Article XI-A of said Constitution."[6]  Cheeks, 287 Md. at 600, 415 A.2d at 258 (ellipsis in original)

---

[6]In Cheeks, 287 Md. at 600 n.3, 415 A.2d at 258 n.3, we described Sections 1-6 of Art. XI as follows:

> Section 1 of Art. XI relates to the Mayor's election, qualifications, compensation, powers, duties, and term of office.  Section 2 relates to the composition of the City Council, the qualifications of the members, their compensation, term of office, powers and duties.  Section 3 relates to the election of members of the City Council.  Section 4 relates to sessions of the City Council.  Section 5 relates to the holding of additional offices or employments by the Mayor and City Council members and prohibits their interest in certain contracts. Section 6 relates to the removal of the Mayor from office.

(footnote omitted). In Chapter 548 of the Acts of 1945, the General Assembly amended the grant of express powers to the City set forth in Article 4, Section 6 of the Public Local Laws of Maryland. See id. at 601, 415 A.2d at 258. The amendment provided, among other things, that the "full power and authority" vested in the City to exercise the express powers granted to it is "power by ordinance, or such other method as may be provided for in its Charter." Id. at 601, 415 A.2d at 258.[7] The current Charter of Baltimore City provides in Article III that "[e]very legislative act of the City shall be by ordinance or resolution." Charter of Balt. City, Art. III, § 14(a).

## The Parties' Contentions

In this case, the City Board and the Alliance contend that the Baby Bonus Amendment does not violate Md. Const., Art. XI-A, § 3 as it leaves "discretion to the local legislative body" concerning how the payments required by the amendment will be made and is, therefore, permissible charter material. The City Board and the Alliance argue that, although the amendment mandates a $1,000 monetary payment to all new parents, the amendment leaves sufficient discretion to the Mayor and City Council of Baltimore to pass constitutional muster because it does not specify which local agency shall distribute the

---

[7]In Chapter 39 of the Acts of 1979, the General Assembly amended the grant of express powers to the City set forth in Article 4, Section 6 of the Public Local Laws of Maryland. The amendment provided, among other things, that the 1979 Edition of the Code of Public Local Laws of Baltimore City "shall be deemed and taken in all the courts of the State and by all public officials of the State and of its several political subdivisions, to be evidence of the Public Local Laws of Baltimore City." See 1979 Md. Laws 246 (Ch. 39, § 1). Additionally, the amendment provided that "any Supplement to [the] code is similarly legalized and effective to contain changes in the Public Local Laws of Baltimore City." Id. at § 2.

payments, how payments will be distributed, or how to determine parents' residency for payment eligibility. According to the City Board and the Alliance, case law does not require that the Mayor and City Council of Baltimore retain "unfettered discretion" over the administration of a charter amendment, and, in this instance, the Mayor and City Council of Baltimore are not precluded from enacting additional legislation in the area, nor must they repeal any existing law.

The Alliance contends that the $1,000 mandatory payment does not render the amendment unconstitutional and points out that the Charter of Baltimore City already contains several provisions that limit or affect the Mayor and City Council's budgetary authority, including provisions that require the City to allocate a percentage of hotel tax proceeds to tourism promotion, direct that certain employees who are transferred from the Police Department to another department retain specific pension benefits, and create an Affordable Housing Trust Fund which mandates that certain payments be deposited into the fund. Relying in part on this observation, the Alliance argues that this Court's holding in Cheeks, 287 Md. 595, 415 A.2d 255, that a charter amendment must concern the "form or structure" of government, was clearly wrong. The Alliance requests that we overrule Cheeks and, as a consequence, not apply in this case its holding that a charter amendment must concern the form and structure of government. The Alliance also asserts that, should this Court find any provision of the Baby Bonus Amendment to be invalid, the provision could be severed, leaving the balance of the amendment's text intact and available for placement on the ballot.

The City responds that because the Baby Bonus Amendment is not limited to

addressing the "form or structure" of government as charter provisions are required to, it violates Md. Const., Art. XI-A, § 3. For the City, the Baby Bonus Amendment is plainly legislative in nature and encroaches on the police and general welfare powers expressly delegated to it by the General Assembly and is therefore not proper charter material. The City describes the Baby Bonus Amendment as "voter-initiated legislation" that, among other things, deprives the City of any "meaningful discretion" regarding a mandatory amount of money that must be distributed to new parents who are residents of the City. The City contends that, for a proposed charter amendment to be constitutional, the local legislature must be given more than minor "bureaucratic or administrative" responsibilities in implementation of a mandatory provision. In sum, the City maintains that the Baby Bonus Amendment is an unconstitutional directive that is legislative in nature and infringes on its police and general welfare powers, and that the amendment's monetary payment provision is not amenable to severability.[8]

### Relevant Case Law

Our case law furnishes multiple examples of circumstances in which we have held that charter amendments violated, or did not violate, Md. Const., Art. XI-A. In one of the earliest cases, <u>Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel Cnty.</u>, 283 Md. 48, 50-52, 64, 388 A.2d 523, 526-27, 533 (1978), when considering whether a Charter provision that gave voters the right to approve or reject local ordinances

---

[8]The State Board did not make any arguments concerning the constitutionality of the Baby Bonus Amendment in its brief before this Court. Rather, the State Board urged this Court to resolve the instant matter before September 6, 2024, so that it could comply with federal and state deadlines for transmission of mail-in ballots.

through a citizen-initiated referendum was constitutional,[9] this Court held that Md. Const., Art. XI-A, § 1 gave voters the right to reserve, "by express charter provision[,]" the ability to repeal or amend legislation enacted by a county council. We examined the historical underpinnings of Md. Const., Art. XI-A and noted that the purpose of the Home Rule Amendment was to "reserve[] to the people of this state the right to organize themselves into semi-autonomous political communities for the purpose of instituting self-government" without substantial interference by the State. Id. at 58, 388 A.2d at 530.

We observed, however, that Art. XI-A does not itself confer legislative powers upon local jurisdictions; instead, it requires that the General Assembly expressly "enumerate and delegate" those powers to jurisdictions electing a charter type of government. Id. at 57, 388 A.2d at 529. We explained that these legislative powers are usually those affiliated with the objects of government—namely, "powers to legislate for the benefit of the health, safety and general welfare of the local community." Id. at 57, 388 A.2d at 529 (footnote

---

[9]The charter provision stated as follows:

> (a) Scope of the referendum. The people of Anne Arundel reserve to themselves the power known as 'The Referendum,' by petition to have submitted to the registered voters of the County, to approve or reject at the polls, any ordinance or part of any ordinance of the County Council. The referendum petition against any such ordinance shall be sufficient if signed by ten per centum of the qualified voters of the County calculated upon the whole number of votes cast in the County for Governor at the last preceding gubernatorial election. Such petition shall be filed with the Board of Supervisors of Elections of Anne Arundel County within forty-five days after the ordinance becomes law.

Ritchmount P'ship, 283 Md. at 52 n.4, 388 A.2d at 527 n.4 (quoting Art. III, § 308 of the Charter of Anne Arundel County).

omitted). There are, however, "certain powers implicit in Article XI-A which do not qualify as legislative powers and which do not require implementing legislation to render them operative." Id. at 58, 388 A.2d at 530. "These powers necessarily proceed from [§] 1 of the Home Rule Amendment and have as their object the initial organization and formation of charter government in the counties." Id. at 58, 388 A.2d at 530 (citation omitted).

We made clear that when voters adopt a charter in a home rule county, they have the power to propose and adopt any provision concerning the "form of government" they wish to be subject to, so long as the provision does not violate the federal or state constitution. Id. at 59, 388 A.2d at 530. We explained that "Article XI-A was intended to encompass two distinct categories of home rule powers: the power to enact local law (legislative power) and the power to form and establish local government" and that it was our job to decide into which of the two categories the referendum at issue fell. Id. at 59, 388 A.3d at 530-31. We expressly stated: "If the referendum is a power arising under [§] 1 of Article XI-A, that is, one respecting the formation and structure of local government, we need look no further to identify the grounds for upholding [its] constitutionality" because "the referendum would then have been a power vested directly in the people [] under the Home Rule Amendment." Id. at 59, 388 A.2d at 531. If, however, the referendum fell outside the scope of Art. XI-A, § 1, then "its exercise must have been expressly authorized by the Legislature." Id. at 60, 388 A.2d at 531.

After setting forth the above framework, we concluded that the citizen referendum at issue did not require any implementing legislation. See id. at 61-62, 388 A.2d at 532.

We observed that Md. Const., Art. XI-A, § 3 only requires that the County Council be the "primary" legislative body.  Id. at 63, 388 A.2d at 533.  We pointed out that the Framers intended to denote that a County Council's "power to legislate over local affairs" was "ample and complete[,]" not to preclude the existence of a separate entity with coordinate power.  Id. at 63, 388 A.2d at 533.  We stated that, "while Article XI-A, [§] 3 bestows upon the county council ample and complete power to legislate within the limits set forth in the Express Powers Act, it does not necessarily confer the exclusive power to do so."  Id. at 63, 388 A.2d at 533.  Thus, we held that the charter provision was constitutional and that the citizen referendum initiated pursuant to it was valid.  See id. at 64, 388 A.2d at 533.

Next, in Cheeks, 287 Md. at 601-02, 609-10, 612-13, 415 A.2d at 258, 262, 264, we considered whether voters could amend the Charter of Baltimore City to establish a non-elective Tenant-Landlord Commission with authority to set rental rates throughout the City[10] and held that the proposed amendment violated Md. Const., Art. XI-A, §§ 2, 3, 5,

---

[10]The charter amendment provided for the creation of a non-elective Tenant-Landlord Commission, stating in pertinent part:

> (a) Composition: There shall be in the City of Baltimore a Tenant-Landlord Commission ("the Commission") composed of five (5) resident, registered voters of Baltimore City appointed by the City Council.  Two (2) members shall be landlords, one of whom shall be a landlord owning, managing or having interests in less than ten (10) rental units.  Two (2) members shall be tenants and not own, manage or have interest in any rental property, one of whom shall be a low to moderate income person.  One member shall be a home-owner and shall not own or have interest in any rental unit.

Cheeks, 287 Md. at 617, 415 A.2d at 266 (quoting proposed Art. 6(a), § 3 of the Charter of Balt. City).

and 6 because it allowed voters to circumvent the legislative process and exercise the City's police powers. In <u>Cheeks</u>, <u>id.</u> at 607, 415 A.2d at 261, in reviewing the citizen-initiated amendment, we unequivocally held that a charter amendment must be limited to "amending the form or structure of government initially established by adoption of the charter." Because the proposed charter amendment did not purport to merely establish a new commission, but also aimed to establish a system of rent control, we concluded that it

---

Additionally, the charter amendment provided for rent stabilization and a base rent ceiling, stating in pertinent part:

(a) Rent Stabilization. As of March 1, 1980, and for so long as the system of rent controls are set forth herein shall be in effect, no landlord may increase, offer to increase, or give notice of intent to increase the rent for a rental unit to an amount in excess of the base rent ceiling for that rental unit, except as provided in this Article.

(b) Base Rent Ceiling. The rent in effect on November 1, 1978 for any rental unit plus the allowable increase, as set forth below, shall constitute the base rent ceiling. The allowable increase, calculated as a percentage of the rent in effect as of November 1, 1978, is as follows:

(1) If the rent includes the cost of all utilities, the allowable increase is six (6) per cent, if heat only then five and one-half (5.5) per cent;

(2) If the rent includes the cost of the gas and electric utilities only, the allowable increase is five (5) per cent;

(3) If the rent includes the cost of gas and electric utilities, but not both, the allowable increase is four and one-half (4.5) per cent; or

(4) If the rent includes neither heat, gas nor electric utilities, the allowable increase is four (4) per cent.

<u>Id.</u> at 622, 415 A.2d at 268-69 (quoting proposed Art. 6(a), §§ 9(a)-(b) of the Charter of Balt. City).

constituted an exercise of the City's police power and was not "charter material[.]"  Id. at

608, 415 A.2d at 261-62.  We explained that the power to amend a city charter by vote

"may not be exercised in violation of other powers vested in the City under Art. XI-A."  Id.

at 609, 415 A.2d at 262.  We concluded that the proposed amendment violated Md. Const.,

Art. XI-A, §§ 2 and 3 because it divested the City of its ability to legislate on the topic of

rent control and enlarged the City's "limited grant of express powers[.]"  Id. at 609-10, 415

A.2d at 262.

We also held that the parts of the amendment that were unconstitutional could not

be severed from creation of the non-elective Tenant-Landlord Commission.  See id. at 609,

614, 415 A.2d at 262, 265.  We explained that, although amicus curiae had suggested that

the unconstitutional parts could be severed and that there was a severability clause in the

amendment, the parties took "the position that the amendment is not so severable but rather

is integrated as a whole."  Id. at 614, 415 A.2d at 265.  We concluded that, "[a]fter careful

consideration of the amendment's provisions, we agree[d] with the parties and therefore

[found] that no part of the amendment [was] severable."  Id. at 614, 415 A.2d at 265

(citations omitted).

In Cheeks, id. at 610-12, 415 A.2d at 263-64, we discussed Ritchmount P'ship at

length and stated that, in that case, we held "that the referendum power is a power affecting

the form or structure of local government, as distinguished from the power to enact local

laws which must emanate from an express grant of legislative powers by the General

Assembly."  As such, under Art. XI-A, § 1, the referendum power is implicitly reserved to

the people and is "incorporated into a home rule charter without an express grant of

legislative power, provided that it did not violate any other provision of the Home Rule Amendment." Cheeks, 287 Md. at 612, 415 A.2d at 264. We stated that, in Ritchmount P'ship, the provisions of Art. XI-A, § 3 were not violated because "the County Council remained as the primary legislative organ of the county, i.e., as the ultimate repository of all legislative powers possessed by the county and not expressly reserved to the electorate." Cheeks, 287 Md. at 612, 415 A.2d at 264. We distinguished Ritchmount P'ship by explaining that the case "did not involve, as here, a claim of conflict with the provisions of [§§] 2 and 6 of Art. XI-A or with the legality of a charter amendment under [§] 5." Cheeks, 287 Md. at 612, 415 A.2d at 264. We stated that nothing in Ritchmount P'ship was "even remotely at odds with our conclusion that the amendment [at issue] violates [§] 2, is not authorized by [§] 6, and does not qualify as a charter amendment under [§] 5." Cheeks, 287 Md. at 612-13, 415 A.2d at 264. We concluded that the proposed charter amendment violated Art. XI-A, § 3 because it was "legislative in character" and constituted "an exercise of the police power [in] an attempt to legislate by charter initiative[.]" Id. at 613, 415 A.2d at 264.

In Griffith v. Wakefield, 298 Md. 381, 382, 390, 470 A.2d 345, 346, 350 (1984), this Court held that a proposed amendment to the Charter of Baltimore County requiring that resolution of all labor disputes involving county firefighters be conducted using binding arbitration was not proper charter material.[11] Relying on Cheeks, we concluded

---

[11]We described the proposed amendment as follows:

that a charter amendment may not prescribe a "detailed" system for managing labor disputes that left no discretion over the area to county officials. Griffith, 298 Md. at 386, 388, 470 A.2d at 348, 349.

We concluded that the proposed amendment was "essentially legislative in character" as it would prevent elected county officials from making any independent decisions regarding the "wages, benefits, hours, and working conditions" of county firefighters. Id. at 388, 470 A.3d at 349. We explained that the proposed amendment would require the County Executive to include in the expense budget submitted to the County Council *all* funds necessary for an arbitrator's final decision and that the funds

---

[T]he amendment mandates that if the certified employee organization or organizations representing the fire fighters and the county have not reached a written contract agreement on terms and conditions of employment by the first day in March in any year, submission to a board of arbitration is mandatory upon the request of either party. The amendment sets forth, in minute detail, the composition, function and powers of the board. The board is to be composed of three members. One member is to be appointed by the County Executive and one is to be appointed by the certified fire fighters organization; both of these members must be selected within four days of the request for arbitration. The third member is to be selected by the two previously chosen members, also within four days, from a list of candidates furnished by the American Arbitration Association. In the event that two arbitrators are unable to agree on the choice of the third arbitrator, the American Arbitration Association is to select the third arbitrator, who shall act as chairman of the board of arbitration. The board is to begin the arbitration proceedings within seven days after the selection of the chairman and to make its decision within fifteen days after the commencement of the arbitration proceedings, although the chairman may extend this time requirement. The board is granted the power to administer oaths, compel the attendance of witnesses, and require the production of evidence by subpoena. The proposed amendment also delineates the factors to be considered by the board in making its award.

Griffith, 298 Md. at 386-87, 470 A.2d at 348 (cleaned up).

could not be decreased or deleted by the County Council and would not be subject to prior approval by the County Council—meaning that the binding arbitration provision of the amendment would essentially "divest the elected officials of Baltimore County of any discretion in reaching an agreement on the wages, benefits, hours and working conditions of the fire fighters." Id. at 387-88, 470 A.2d at 349 (cleaned up).

We noted that, in attempting to distinguish the case from Cheeks, the firefighters association mistakenly relied on Md. Classified Emps. Ass'n v. Anderson, 281 Md. 496, 380 A.2d 1032 (1977). See Griffith, 298 Md. at 388, 470 A.2d at 349. We stated that, in Anderson, we held that the Harford County Council lacked the authority to enact an ordinance which mandated that a decision of an arbitration board on wages and benefits for county employees would be binding upon the county. See Griffith, 298 Md. at 388, 470 A.2d at 349. We pointed out that, in Anderson, we concluded that, absent authorization by a state public general law or the county charter, the Harford County Council lacked the authority to delegate what was essentially a legislative function to a board of arbitrators. See Griffith, 298 Md. at 388-89, 470 A.2d at 349.

In urging that the proposed charter amendment requiring binding arbitration for resolution of labor disputes was proper charter material, the firefighters association argued that because Anderson "held that authorization of the charter is required, then the matter must be one which is concerned with the form and structure of government and is properly deemed charter material." Griffith, 298 Md. at 389, 470 A.2d at 350 (cleaned up). We explained that the association's reliance on the case was misplaced and that its argument failed "to distinguish between 'authorization' on the one hand and a detailed local

- 24 -

enactment on the other hand." Id. at 389, 470 A.2d at 350. We stated that, although "[i]t is common for constitutions or charters to authorize, or preclude, specified types of enactments by legislative bodies[,]" that "is quite different from a charter itself containing all of the detailed provisions concerning the subject." Id. at 389, 470 A.2d at 350.

We explained that, had the proposed charter amendment in the case simply authorized the Baltimore County Council to enact a binding arbitration system for compensation of county employees and, pursuant to that authorization, the Baltimore County Council had exercised its discretion to enact an ordinance containing provisions similar to those of the amendment, the case would have been distinguishable from Cheeks. See Griffith, 298 Md. at 389-90, 470 A.2d at 350. We pointed out that because the proposed charter amendment did not simply authorize the County Council to enact binding arbitration legislation for county employees and did not authorize any decisions by the legislative body, but instead contained "all of the law on the subject" and deprived the County Council "of all decision-making authority concerning the subject[,]" "[n]othing in the *Anderson* case support[ed its] validity, under Art. XI-A[.]" Griffith, 298 Md. at 390, 470 A.2d at 350.

In Bd. of Supervisors of Elections of Anne Arundel Cnty. v. Smallwood, 327 Md. 220, 228, 234, 608 A.2d 1222, 1226, 1228-29 (1990), in two cases, one involving two proposed amendments to the Charter of Anne Arundel County and one involving a proposed amendment to the Charter of Baltimore County, we explained the reasons for earlier orders of this Court requiring each county's Board of Election Supervisors to place property tax limitation amendments on the ballots, with parts of the amendments severed,

- 25 -

and prohibiting altogether the Anne Arundel County Board of Election Supervisors from placing a "ballot initiative" amendment on the ballot. We described the proposed property tax limitation charter amendment in Baltimore County as follows: the amendment "would have required the property tax revenues for the tax year 1991-1992 to be limited to the amount of property tax revenues realized for the tax year 1989-1990; [] would not have allowed the tax revenues to be raised by more than 2% per year, beginning with tax year 1992-1993[;]" and contained an "'escape clause' [that] would have permitted the county council to increase property taxes by more than the 2% maximum when at least two-thirds of the qualified registered voters in the county approved the increase by referendum." Id. at 229, 608 A.2d at 1226. We stated that the proposed property tax limitation charter amendment in Anne Arundel County "would have limited property tax revenues for the tax year 1991-1992 to the amount of property revenues raised during the 1988-1989 tax year[,]" "would have placed the tax cap provision . . . in the context of the constant yield tax rate provided for in the Tax-Property Article of the Annotated Code of Maryland[,]" and "contained an 'escape clause' that would have allowed the county council to exceed the cap upon approval by the qualified voters of the county in a referendum."[12] Id. at 231-32, 608 A.2d at 1227-28.

With respect to the property tax limitation charter amendments in both counties, we held that the tax cap portion of the amendments, which "would have placed a percentage

_____

[12]The proposed property tax limitation amendment in Anne Arundel County contained a 4.5% tax cap, unlike the proposed Baltimore County amendment, which contained a 2% tax cap. See Smallwood, 327 Md. at 242, 608 A.2d at 1233.

cap on the amount of local property tax revenues to be raised each year[,]" constituted proper charter material but that two other aspects of the proposed amendments were invalid. Id. at 236, 244, 608 A.2d at 1230, 1234. We explained that a county charter is analogous to a state or federal constitution because its chief objective is to distribute power among government agencies and to define the people's relationship to government. See id. at 237, 608 A.2d at 1230. We concluded that placing a percentage cap on local property taxes directly involves the people's relationship with government because it is a limitation on the government's power to tax and raise revenue. See id. at 237-38, 608 A.2d at 1230-31. We pointed out that the federal Constitution, the Constitution of Maryland, and the charters of Anne Arundel and Baltimore Counties are "replete" with limitations on the government's ability to raise and appropriate revenue and we noted that the desire to place limitations on the government's ability to tax was "a major cause of the American Revolution." Id. at 237-38, 608 A.2d at 1231. We held that "a provision in a county charter placing restrictions upon the county council's revenue raising authority is a fundamental aspect of the form and structure of government and thus is proper charter material." Id. at 241, 608 A.2d at 1232.[13]

---

[13]We rejected the contention that the proposed property tax percentage cap limitation amendments conflicted with public general law, specifically, Md. Code Ann., Tax-Prop. § 6-302(a), which provided that a government body of a county shall set the tax rate on property for the next taxable year, and Md. Code Ann., Tax-Prop. § 6-308, which specified procedural requirements that a county governing body needed to comply with before it would be permitted to increase the tax rate above the constant yield rate. See Smallwood, 327 Md. at 241-43, 608 A.2d at 1232-33. We explained that the proposed property tax limitations would not have had the effect of allowing the voters of the two counties to set the tax rates and that, instead, as required by Md. Code Ann., Tax-Prop. §

Although we held that the tax cap portions of the property tax limitation amendments were valid, we concluded that the two other aspects of the amendments were invalid, but that those portions of the amendments were severable. See id. at 244, 608 A.2d at 1234. First, we determined that the "roll back" provisions of the amendments—which would have limited the amount of property tax revenues for the tax year 1991-1992 to no more than the amount collected in the tax year 1989-1990 for Baltimore County and no more than the amount collected in the tax year 1988-1989 for Anne Arundel County— violated Md. Code Ann., Tax-Prop. § 6-302(a), which requires "that the governing body of each county is to set the property tax rate for the next tax year." Id. at 244, 608 A.2d at 1234. We explained that, "[u]nlike the tax cap provisions that would have simply placed a limit on the taxing power of each county council, the roll back provisions would have transferred the county councils' § 6-302 powers to the voters." Id. at 244, 608 A.2d at 1234. In other words, the roll back provisions would have impermissibly enabled voters in the two counties to set property tax rates for the tax year 1991-1992. See id. at 244, 608 A.2d at 1234.

Second, we held that the escape clause provisions of the amendments—which would have permitted the county councils to increase property tax rates for a tax year above

6-302(a), each county's legislative body would continue to set the property tax rate. See id. at 242-43, 608 A.2d at 1233. And, we explained that Md. Code Ann., Tax-Prop. § 6-308 "is a procedural provision limiting a county's authority, rather than an affirmative grant of power," and as such did not conflict with the proposed property tax limitation amendments. Id. at 243, 608 A.2d at 1233. We thus held that the tax cap portions of the property tax limitation amendments "were facially valid because they constituted proper charter material and did not conflict with public general law." Id. at 243, 608 A.2d at 1233.

the rate specified in the tax cap by referring the proposed increase to the voters for approval—were also invalid and violated Md. Code Ann., Tax-Prop. § 6-302(a). See id. at 244-45, 608 A.2d at 1234. We explained that "[t]he effect of the escape clause provisions would have been that, even if a county council would determine in any given year that it is necessary to raise the tax rate above the limit specified by the cap, the voters of the county could have decided whether the rate would be raised to particular levels above the caps or would remain at cap levels." Id. at 245, 608 A.2d at 1234. Like the roll back provisions, the escape clause provisions would have essentially permitted voters to set the tax rate in violation of Md. Code Ann., Tax-Prop. § 6-302(a). See id. at 245, 608 A.2d at 1234.

We held that the roll back and escape clause provisions of the property tax limitation amendments were severable from valid portions of the amendments. See id. at 245, 608 A.2d at 1234. We explained that a strong presumption toward severability exists, and that this presumption exists even in the absence of an express clause indicating that the drafters intended for any invalid or unconstitutional provisions to be severed. See id. at 245-46, 608 A.2d at 1234. Where the dominant purpose of an enactment can largely be carried out despite invalid parts, "courts will generally hold the valid portions severable and enforce them." Id. at 246, 608 A.2d at 1235 (cleaned up). We stated that the dominant purpose of the property tax limitation amendments "was to place a cap on property tax revenues[,]" that the tax cap provisions were facially valid, and that the purpose of the tax cap could be achieved without the invalid roll back or escape clause provisions. Id. at 246, 608 A.2d at 1235. Because we determined that severing the invalid parts of the amendments would not

destroy the dominant purpose of the amendments, we ordered the invalid roll back and

escape clause provisions of the amendments severed.  See id. at 248, 608 A.2d at 1236.

In Save Our Streets, 357 Md. at 240-41, 743 A.2d at 750, this Court considered

whether a proposed amendment to the Montgomery County Charter that would have

prohibited the expenditure of county funds to install or maintain speed bumps and required

removal of all previously installed speed bumps within one year of the amendment's

effective date was unconstitutional.[14]  We also considered whether a proposed amendment

to the Harford County Charter that would have required developers to meet several

"adequacy" standards before expanding private or public property was unconstitutional.

Id. at 243-44, 743 A.2d at 752.[15]  We held that both proposed amendments imposed tight

_____

[14]The proposed Montgomery County Charter amendment stated as follows:

> County funds shall not be spent to install or maintain on any road or
> street any permanent physical obstacle to vehicular movement, which for
> purposes of this section means any speed bump or hump.  Any such device
> previously installed shall be removed within twelve months after this section
> takes effect, unless the Council by an affirmative vote of seven members
> approves its continued use at that location, after a public hearing for which
> notice was posted at or near the location of the device.

Save Our Streets, 357 Md. at 240 n.2, 743 A.2d at 750 n.2 (quoting proposed § 311(C) of
the Charter of Montgomery County).

[15]The proposed Harford County Charter amendment contained, in pertinent part, the
following language:

> Adequacy standards for the use or the development of public and/or
> private property for residential or commercial purposes are not met where:

> (1) the existing County, State and Federal roads, including road
> segments and intersections, in all directions from each point of
> entrance of the property through the intersection with the first arterial

restrictions on the counties and removed the County Councils' ability to exercise discretion and consequently, were unconstitutional.  See id. at 239, 255, 743 A.2d at 749, 758.

We reiterated the basic principle that a county charter is the functional equivalent of a state or federal constitution and is "'intended to provide a broad organizational framework establishing the form and structure of government[.]'" Id. at 248-49, 743 A.2d

roadway to the next intersecting collector or higher functional classification road as defined by the Harford County Transportation Plan are accommodating vehicular traffic at a level of service of 'D' or below as defined by the Highway Capacity Manual or other equivalent standard in use by the County, or

(2) the existing County, State and Federal roads, or any road segment within three miles of the property, are accommodating vehicular traffic at a level of service of 'D' or below as defined by the Highway Capacity Manual or other equivalent standard in use by the County, or

(3) the existing State and Federal roads, or any road segment, outside of the County are accommodating vehicular traffic at a level of service of 'D' or below as defined by the Highway Capacity manual or other equivalent standard, and the low level of service is directly or proximately caused by vehicular traffic originating from within the County, or

(4) the police, fire, or emergency medical response services providing service to the property, are not sufficient to meet the needs of the existing residential and business population according to applicable standards established for each type of service, or

(5) the recreational facilities and public open space are not sufficient to meet the needs of the existing residential population according to applicable standards established for recreational facilities and public open space.

Save Our Streets, 357 Md. at 242 n.4, 743 A.2d at 751 n.4 (quoting proposed Art. VII, § 710 of the Charter of Harford County).

at 755 (quoting <u>Cheeks</u>, 287 Md. at 607, 415 A.2d at 261). And, "'[a] charter amendment within the context of Art. XI-A is necessarily limited in substance to amending the form or structure of government initially established by adoption of the charter.'" <u>Id.</u> at 249, 743 A.2d at 755 (quoting <u>Cheeks</u>, 287 Md. at 607, 415 A.2d at 261). We concluded that applying this standard does not mean that any proposed charter amendment expressed as a limitation on governmental power is necessarily valid under Md. Const., Art. XI-A. <u>See id.</u> at 252, 743 A.2d at 756. We explained that, under Art. XI-A, "enactment of specific legislation is left to the elected legislative bodies." <u>Id.</u> at 252, 743 A.2d at 757 (footnote omitted). "As Chief Justice John Marshall emphasized early in our nation's history, a constitution necessarily provides a broad framework which both empowers and limits a legislature in its enactment of specific laws[.]" <u>Id.</u> at 252 n.10, 743 A.2d at 757 n.10 (citation omitted).

We concluded that neither of the proposed charter amendments involved the imposition of "general and fundamental limitations on a governmental power[.]" <u>Id.</u> at 253, 743 A.2d at 757. We determined that both charter amendments were analogous to those examined in <u>Cheeks</u> and <u>Griffith</u>, as they prescribed detailed legislative schemes. <u>See</u> <u>Save Our Streets</u>, 357 Md. at 253, 743 A.2d at 757.[16] We explained, though, that a proposed charter amendment simply being "lengthy" or "detailed" is not dispositive as to

_____

[16]We explained that the tax cap charter amendments in <u>Smallwood</u> were distinguishable because they precluded the county councils' power to enact a particular type of legislation, which is proper charter material. <u>See</u> <u>Save Our Streets</u>, 357 Md. at 253, 743 A.2d at 757. In contrast, we noted that a charter amendment which itself seeks to enact legislation is not proper charter material. <u>See id.</u> at 253, 743 A.2d at 757.

whether it constitutes legislation or proper charter material. Id. at 253, 743 A.2d at 757. Rather, a key consideration is the degree to which the local legislative body retains and may exercise discretion "regarding an area under its authority pursuant to Article XI-A of the Maryland Constitution." Id. at 253, 743 A.2d at 757. We noted that a local legislative body may still exercise substantial discretion over an area when a charter amendment authorizes or precludes a given type of legislation, like the percentage cap in Smallwood. See Save Our Streets, 357 Md. at 254-55, 743 A.2d at 758. We noted, however, that a local legislative body does not retain discretion to act where a charter amendment "narrowly mandate[s]" a particular course of conduct. Id. at 255, 743 A.2d at 758.

In Atkinson v. Anne Arundel Cnty., 428 Md. 723, 735-36, 749-50, 53 A.3d 1184, 1191-92, 1200 (2012) ("Atkinson I"), we considered whether a charter provision, Charter § 812, which directed the Anne Arundel County Council to implement binding arbitration in labor disputes, violated Md. Const., Art. XI-A by precluding the County Council from exercising "law-making discretion."[17] We held that, pursuant to this Court's precedent,

---

[17]In 1988, a provision was added to the Anne Arundel County Charter that stated that "[e]mployees in the classified service shall have the right to organize and bargain collectively through representative employee organizations of their own choosing as provided by ordinance of the County Council." Atkinson I, 428 Md. at 734, 53 A.3d at 1191 (brackets in original) (quoting § 811 of the Charter of Anne Arundel County). In 2002, voters amended the Anne Arundel County Charter, adding the following provision regarding binding arbitration for a select group of uniformed employees:

> (a) In addition to the right granted to County employees in Section 811 of this Article to organize and bargain collectively, the County Council shall provide by ordinance for binding arbitration with authorized representatives of the appropriate employee bargaining unit in order to resolve labor disputes with the County's law enforcement employees. The

the charter provision directing the County Council to adopt a binding arbitration ordinance was proper charter material.  See id. at 747-50, 53 A.3d at 1198-1200.  Likewise, we held that the binding arbitration provision did not preclude the County Council from exercising "law-making discretion," as it left all details for implementation to the County Council.  Id. at 749-50, 53 A.3d at 1200.

We explained that it is "settled" law that binding arbitration provisions are fit for inclusion in a county charter.  Id. at 745, 53 A.3d at 1197 (citing Anderson, 281 Md. at 512, 380 A.2d at 1041 ("[H]ad a State public general law *or* the County Charter authorized the binding arbitration provisions enacted by the County Council, the provisions would be valid.") (Emphasis added)); Anne Arundel Cnty. v. Fraternal Ord. of Anne Arundel Det. Officers and Pers., 313 Md. 98, 111, 543 A.2d 841, 848 (1988) ("[A] charter county may

---

ordinance shall provide for the appointment of a neutral arbitrator by the parties to the arbitration who shall issue a binding decision to be implemented as part of the following year's budget process and which shall take into account the financial condition of the County and the reasonable interests of the law enforcement employees and the county relating to the terms and conditions of employment.  Law enforcement employees shall be uniformed officers of the Police Department, Sheriff's Department, and Office of Detention Facilities.  Any ordinance that is enacted shall prohibit strikes or work stoppage by the law enforcement employees.

Id. at 735-36, 53 A.3d at 1191-92 (quoting § 812 of the Charter of Anne Arundel County). Section 812(b) of the Charter of Anne Arundel County extended the binding arbitration provision to uniformed firefighters.  See id. at 736, 53 A.3d at 1192.  In 2011, an ordinance enacted by Council Bill 4-11 amended the Anne Arundel County Code to provide, in relevant part, that "[e]xcept for those provisions that require an appropriation of funds or the enactment of legislation to implement, the final written award issued by the neutral arbitrator and the memorandum of agreed issues shall be final and binding upon the County[,]" which called the charter provision, § 812, into question.  Id. at 738, 53 A.3d at 1193 (cleaned up).

not, absent authorization by public general law *or* charter provision consistent with Art. XI-A of the Maryland Constitution, delegate to an arbitrator a discretionary governmental power or function which the charter vests in the county executive and county council.") (Emphasis added)); Freeman v. Local 1802, Am. Fed'n of State, Cnty., and Mun. Emps. Council 67, 318 Md. 684, 691, 569 A.2d 1244, 1247 (1990) (same)).

We rejected the position that only a county council may ultimately decide whether to adopt a binding arbitration policy for county employees. See id. at 748, 53 A.3d at 1199. We noted that the charter provision at issue significantly differed from the charter amendment before the Court in Griffith, as it did not "contain[] all of the law on the subject" of binding arbitration. Atkinson I, 428 Md. at 747-48, 53 A.3d at 1198. We observed that, in Griffith, we "illustrated a proper recognition of the Council's constitutional law-making power" by "hypothesizing" a charter amendment that provided that the Council may adopt binding arbitration but "[left] to the Council the policy question of whether, and if so, how, binding arbitration should operate." Atkinson I, 428 Md. at 747, 53 A.3d at 1198.

We concluded that the charter provision at issue altered only the "form or structure of government," as it provided for a "method or system" for resolving labor disputes. Id. at 749-50, 53 A.3d at 1199-1200 (cleaned up). We held that, because the charter provision, Charter § 812, "made [a] policy decision" only, and left all details concerning its implementation to the County Council,[18] the provision did not "unconstitutionally preclude

---

[18]Importantly, we underscored that the County Council subsequently adopted Bill 1-03, codified at § 6-4-111 of the Anne Arundel County Code. See Atkinson I, 428 Md.

- 35 -

the exercise of the County Council's law-making discretion." Id. at 749-50, 53 A.3d at 1200.

In Atkinson v. Anne Arundel Cnty., 236 Md. App. 139, 179-80, 181 A.3d 834, 857-58 (2018) ("Atkinson II"), the Appellate Court of Maryland relied on our holding in Atkinson I, in which this "Court decided that the voters of Anne Arundel County determined in Charter § 812 that the County Council would not have discretion to reject the effect of binding arbitration[,]" and concluded that "the voters also determined through Charter §§ 811 and 812 that the Council cannot define and limit the subject matter of collective bargaining and arbitration to a *de minimis* level." (Cleaned up). The Appellate Court noted that a permissible charter amendment must afford a county council with significant "discretion and control regarding an area under its authority pursuant to Article XI-A of the Maryland Constitution." Atkinson II, 236 Md. App. at 178-79, 181 A.3d at 857 (cleaned up). We declined the County's petition for writ of *certiorari* in Atkinson II. See Anne Arundel Cnty. v. Atkinson, 460 Md. 5, 188 A.3d 919 (2018).

_____

at 736, 53 A.3d at 1192. We pointed out that the ordinance contained all the relevant details concerning implementation of the charter amendment, stating as follows:

> It cover[s] possible mediation, each step in the selection of the neutral arbitrator, timing, the powers of the arbitrator, receipt of final offers of each party, ten factors to be considered by the arbitrator after receiving evidence, the final, binding award, possible revision thereof by agreement, post-hearing motion or court action, and implementation of the award as part of the budget process.

Id. at 750, 53 A.3d at 1200. We noted that the County Council later amended this ordinance to provide that the binding arbitration system did not require the County Council "to appropriate funds or enact legislation necessary to implement a final written [arbitration] award." Id. at 726, 739, 53 A.3d at 1186, 1193.

**The Request to Overrule <u>Cheeks</u>**

The Alliance contends that our holding in <u>Cheeks</u> that proper charter material addresses the form or structure of government was "clearly wrong" and argues that it should be overruled. We could not disagree more. Under the doctrine of *stare decisis*, "we follow and apply our prior decisions even though, if we were starting from a clean slate, we would reach a different decision today." <u>Bennett v. Gentile</u>, 487 Md. 604, 621, 321 A.3d 34, 44 (2024) (citation omitted). The doctrine of *stare decisis* is not absolute, but it is "[o]nly in rare circumstances" that this Court should overrule its own precedent. <u>Wadsworth v. Sharma</u>, 479 Md. 606, 630, 278 A.3d 1269, 1284 (2022) (cleaned up). "We recognize two extremely narrow situations where it would be appropriate" to overrule our own precedent—"when the decision is clearly wrong and contrary to established principles or where there is a showing that the precedent has been superseded by significant changes in the law or facts." <u>Id.</u> at 630, 278 A.3d at 1284 (cleaned up).

We discern no basis on which to overrule <u>Cheeks</u>. In <u>Cheeks</u>, 287 Md. at 607, 415 A.2d at 261, we held that, to comply with Md. Const., Art. XI-A, a charter amendment must address the form or structure of government. There has been no change in the law or development of any circumstances that would lead us to the conclusion that the holding in <u>Cheeks</u> was clearly wrong. We have consistently relied on our holding in <u>Cheeks</u> when assessing the constitutionality of proposed charter amendments. In <u>Atkinson I</u>, 428 Md. at 747-48, 53 A.3d at 1198-99, when faced with a request to dispense with application of the form and structure requirement set forth in <u>Cheeks</u> in assessing the constitutionality of a proposed charter amendment, we declined to do so. Instead, we concluded that for the

form or structure requirement to have any practical effect, a charter amendment must not preclude a local legislative body from the meaningful exercise of discretion over an area under the ambit of Art. XI-A. See Atkinson I, 428 Md. at 749-50, 53 A.3d at 1200. If we were to take the Alliance up on its request to overrule Cheeks, we would be required to also overrule its long-standing progeny, such as Griffith, Smallwood, Save Our Streets, and Atkinson I and II, and we would greenlight an outcome that would permit voters through the charter amendment process to exercise express powers granted to the local legislature under Md. Const., Art. XI-A. See Cheeks, 287 Md. at 608, 415 A.2d at 261-62.

Rather than being anywhere even close to clearly wrong, our holding in Cheeks ensures that a county's "law-making power" remains vested in a legislative body as required by Art. XI-A. See Md. Const., Art. XI-A, § 3. Absent this requirement, voters would be free to use the charter amendment process to enact detailed legislative initiatives, including ones like the rent control system that was squarely rejected in Cheeks, 287 Md. at 608, 415 A.2d at 262. In other words, without this requirement, voters would possess the "full power to enact local laws," so long as minor administrative details were left to the local legislative body. Id. at 608, 415 A.2d at 262. Our Constitution does not condone this result.

**Applying the Principles Above to this Case**

Based on our review of the authority above, we hold that when a charter amendment precludes the local legislature's meaningful exercise of discretion in an area under the ambit of Art. XI-A, § 3 and encroaches upon the City's police or general welfare powers, it does more than address the form or structure of government and is therefore not proper

charter material. What can be distilled from our Constitution and relevant case law is that proper charter material addresses the form or structure of local government and does not preclude a local government from the meaningful exercise of discretion over areas reserved for local legislation.[19] Based on these principles, we concluded that the Baby Bonus Amendment did more than address the form or structure of local government and contained the classic hallmarks of legislation, in violation of Md. Const., Art. XI-A, § 3.

Although it is a well-meant effort to combat childhood poverty, the Baby Bonus Amendment is not an amendment that relates to the form and structure of government in any fundamental sense. The Baby Bonus Amendment is akin to a legislative enactment in that it mandates the making of mandatory minimum payments to certain residents of the City and encroaches on the City's discretion to address matters of public health and welfare concerning children and new parents, which pursuant to Art. XI-A are areas reserved by the General Assembly for local legislation. The powers delegated by the General Assembly to the Mayor and City Council of Baltimore in Article 4, Section 6 of the Public Local Laws of Maryland include actions taken to protect the general welfare of the City.[20] See Cheeks, 287 Md. at 600, 415 A.2d at 257. Article XI-A, § 2 of the Maryland

---

[19]In other words, a proposed charter amendment that does not relate to "the form or structure of government in any fundamental sense" or one that may relate to the form and structure of government but sets forth details or requirements that encroach on the ability of a local legislative body to act in an area reserved for it to legislate in under Article XI-A, is not proper charter material. Cheeks, 287 Md. at 608, 415 A.2d at 262.

[20]The subjects on which counties may legislate are set forth in the Express Powers Act, which is codified at Md. Code Ann., Local Gov't (2013, 2024 Supp.) ("LG") §§ 10-101 to 10-330. LG § 10-206(a)(2) provides that "[a] county council may pass any ordinance, resolution, or bylaw not inconsistent with State law that: . . . may aid in maintaining the peace, good government, health, and welfare of the county."

Constitution provides that express powers granted to "the City of Baltimore, as set forth in Article 4, Section 6, Public Local Laws of Maryland, shall not be enlarged or extended by any charter formed under the provisions of this Article, but such powers may be extended, modified, amended or repealed by the General Assembly." By mandating a minimum payment to the specific groups of individuals identified by the terms of the proposed amendment, the Baby Bonus Amendment in effect strips the Mayor and City Council of the "*full* power and authority to pass ordinances deemed expedient in maintaining the peace, good government, health, and welfare of the City of Baltimore." Cheeks, 287 Md. 600, 415 A.2d at 257 (cleaned up) (emphasis added). In other words, the Baby Bonus Amendment does not address the form or structure of government in any sense and strips the City of full power to legislate in the area of addressing childhood poverty.

With its requirement of a mandatory minimum payment to parents and guardians of newborns, the Baby Bonus Amendment does not permit the City discretion or control regarding the making of mandatory minimum monetary payments. The proposed amendment dictates the groups of residents who are to receive payments from the City and the minimum amount that the payments must be. The Baby Bonus Amendment leaves nothing for the City Council to resolve aside from procedural matters that do not meaningfully impact the operation of the Amendment. See Griffith, 298 Md. at 386, 470 A.2d at 348. As such, the Baby Bonus Amendment is analogous to the proposed charter amendments that we held to be unconstitutional in Cheeks, Griffith, and Save Our Streets. For instance, in Save Our Streets, 357 Md. at 252-53, 743 A.2d at 757, we noted that the proposed charter amendment was marked by "the specificity characteristic of county

council legislative enactments[,]" as opposed to "the fundamental, general nature of a charter[.]"

The Baby Bonus Amendment is materially distinguishable from the charter amendments in Atkinson I and Smallwood that were determined to be valid. In Atkinson I, 428 Md. at 747-48, 53 A.3d at 1198-99, we held that the charter provision that directed the county council to implement binding arbitration in labor disputes was proper charter material as it left "fleshing out of the directive to the County Council." The county council retained authority over "possible mediation, each step in the selection of the neutral arbitrator, timing, the powers of the arbitrator, receipt of final offers of each party, [] factors to be considered by the arbitrator after receiving evidence, the final, binding award, possible revision thereof by agreement, post-hearing motion[s] or court action[s], and implementation of the award as part of the budget process." Id. at 750, 53 A.3d at 1200. By contrast, the Baby Bonus Amendment resolves all decisions of any significance with respect to its mandated minimum payment and leaves essentially nothing for the City Council to "flesh out," aside from how to distribute the payments to eligible residents. This case is much closer to Cheeks and Griffith, which involved, to quote Atkinson I, 428 Md. at 746, 53 A.3d at 1197, attempts to "includ[e] what amount[ed] to [] entire statute[s] in the Charter[.]"

In Smallwood, 327 Md. at 238, 608 A.2d at 1231, we held that proposed amendments that placed a percentage cap on local property taxes were proper charter material because "a limitation on the power of a legislative body to raise revenue is at the heart of the form and structure of our government[.]" (Citations omitted). Relying on

- 41 -

overarching principles dating back to <u>Marbury v. Madison</u>, 1 Cranch 137, 176-77, 2 L.Ed. 60, 73 (1803), we pointed out that both the United States Constitution and the Maryland Constitution contain several provisions that limit the government's ability to tax. <u>Id.</u> at 237-38, 608 A.2d at 1230-31. Conversely, the proposed Baby Bonus Amendment enables voters to exercise the City's police or general welfare powers by mandating monetary payments of at least $1,000 to a specific group of residents in an attempt to address childhood poverty. <u>See</u> Md. Const., Art. XI-A, § 2; Article 4, Section 6, Public Local Laws of Maryland. At bottom, an amendment requiring payments of at least $1,000 to all new parents in Baltimore City is not a provision that affects "the form and structure of our government[,]" and is therefore not "proper charter material." <u>Smallwood</u>, 327 Md. at 238, 608 A.2d at 1231 (citations omitted).

**The Children and Youth Fund**

In its brief, the Alliance contended that the Baby Bonus Amendment was directly analogous to other provisions of the Baltimore City Charter, in particular the Children and Youth Fund, and pointed out that the funding provision of the Children and Youth Fund is identical to that of the Baby Bonus Amendment. The Children and Youth Fund amendment was added to the Charter through City Council resolution and voter ratification. The Alliance asserted that prior to its adoption the Baltimore City Law Department reviewed the proposed Children and Youth Fund Amendment and "found no constitutional problems with the Children and Youth Fund proposal—failing to mention at all any alleged usurpation of legislative or police powers that it now claims with the Baby Bonus." (Cleaned up).

In Atkinson I, 428 Md. at 745, 53 A.3d at 1197, we assumed without deciding "that a charter amendment recommended by a Charter Revision Commission and proposed by the legislative body is subject to the requirement that the amendment be charter material to the same extent as if the amendment had been initiated by a petition of the voters." We reiterated:

> "This Court has taken the position that the method or system for budgeting and appropriating revenues set forth in a county's charter, including the executive budget system in effect in several counties, constitutes proper *charter material* under Article XI-A, § 1. The budgetary and appropriation system 'is a fundamental aspect of the form and structure of' a home rule county's government. *Board of Supervisors of Elections of Anne Arundel County v. Smallwood*, 327 Md. 220, 241, 608 A.2d 1222, 1232 (1992)."

Atkinson I, 428 Md. at 749, 53 A.3d at 1199-1200 (cleaned up) (emphasis added). After reaffirming this basic principle, in a footnote, we stated: "In view of our holding, we need not address Petitioners' argument that the *Cheeks* requirement of 'charter material' does not apply to a Charter amendment that is proposed by the Council, as contrasted with those amendments that are initiated by voters' petitions for a Charter referendum."[21] Id. at 750 n.11, 53 A.3d at 1200 n.11.

The City Council's resolution for the Children and Youth Fund amendment was ratified by voters on November 8, 2016, in the November 2016 Presidential General

---

[21]Read in context, our holding in Atkinson I does not necessarily lead to the conclusion that we assumed, purely for argument's sake, that the charter material analysis applies to County-initiated charter amendments to the same extent as voter-initiated charter amendments. In light of our discussion in Atkinson I, it is not clear that the factual distinction between a charter amendment being citizen-initiated versus legislatively-initiated is dispositive as to whether the charter material test applies. But, this is not a question before the Court today.

Election.  At the time that the City Law Department reviewed the Children and Youth Fund amendment, based on our case law, it was clear that this Court had not adopted a standard different from the "charter material" standard set forth in Cheeks for evaluation of the constitutionality of charter amendments proposed by a local legislature.  After its proposal, the Children and Youth Fund amendment was not challenged, and this Court was not called upon to review its constitutionality.  And we do not do so today.  In this opinion, we neither address nor resolve the issue of whether the charter material analysis applies to legislatively-initiated charter amendments, or whether the Children and Youth Fund amendment is constitutional.  However, given the comparison made by the Alliance and the allegation that the City essentially applied a double standard with respect to its review of the Baby Bonus Amendment, we would be remiss not to address the dissimilarity of the two amendments under the charter material standard.

Although some of the language of the Baby Bonus Amendment is undeniably identical to that of Art. I, § 13 of the Charter of Baltimore City, unlike the Children and Youth Fund, the Baby Bonus Amendment does not leave any meaningful discretion to the City.  The Children and Youth Fund does not require mandatory payments to a select group of Baltimore City residents.  Rather, the Children and Youth Fund establishes a non-lapsing fund for a broad range of initiatives, all of which are aimed at youth development.  Art. I, § 13 of the Charter of Baltimore City provides as follows:

(a)     *Fund established; Scope.*

(1) There is a continuing, non[-]lapsing Baltimore City Children and Youth Fund, to be used exclusively for purposes of establishing new and augmenting existing programs for and services to the

children and youth of this City.

(2) These programs and services must be from among those designed to:

   (i)   ensure that Baltimore's children and youth are healthy, are ready to learn and succeed in school, and live in stable, safe, and supportive families and communities;

   (ii)  ensure that Baltimore City supports families as an important part of the City population and civic culture;

   (iii) focus on the prevention of problems and on supporting and enhancing the strengths of children, youth, and their families;

   (iv)  complement the City's community development efforts;

   (v)   strengthen community-based networks of recreation and after-school services in all neighborhoods; and

   (vi)  ensure that children and youth with the highest needs receive maximum benefit from the Fund.

(3) The Fund shall be administered in accordance with the following standards:

   (i)   programs and services shall be provided and funds allocated based on best practices and successful and innovative models;

   (ii)  to the maximum extent feasible, funds shall be allocated equitably among services for all age groups – from infancy to transitional-aged youth;

   (iii) programs and services shall be gender-responsive and culturally competent; and

   (iv)  programs and services shall be designed to strengthen collaboration among service providers for children, youth, and their families, including collaboration among public agencies and non-profit organizations.

* * *

(b)     *Limitations on use.*

The Children and Youth Fund may not be used to substitute for or replace funding for children and youth programs or services provided in the Ordinance of Estimates for Fiscal Year 2017, except to the extent that federal, state, or private agency funds for those programs or services have since been discontinued.

(c)     *Revenue sources.*

The Children and Youth Fund shall comprise:

(1) a mandatory annual appropriation in the Ordinance of Estimates of an amount equal to at least $0.03 on every $100 of assessed or assessable value of all property in the City of Baltimore (except property exempt by law); and

(2) grants and donations made to the Fund.

(d)     *Continuing nature of Fund.*

Notwithstanding any other provision of this Charter, unspent portions of the Children and Youth Fund:

(1) remain in the Fund, to be used exclusively for its specified purposes;

(2) do not revert to the general revenues of the City; and

(3) their appropriations do not lapse.

(e)     *Implementation.*

By Ordinance, the Mayor and City Council shall provide for the oversight, governance, and administration of the Children and Youth Fund, including:

(1) methods and criteria for identifying specific program and services eligible for funding by the Fund;

(2) methods and criteria for allocating available funds among eligible

> programs and services; and
>
> (3) the establishment of any other legislative or administrative rules, regulations, or standards, consistent with this section, governing the Fund, its operations, and programs and services funded by it.

In considering the constitutionality of the Baby Bonus Amendment, the circuit court noted that the Children and Youth Fund sets forth "broad parameters" for programs and services for City youth—rather than a detailed legislative scheme—and "leaves meaningful discretion to the City," and concluded that the Children and Youth Fund is distinguishable from the Baby Bonus Amendment. We agree.

Unlike the Baby Bonus Amendment, the Children and Youth Fund does not mandate what programs the City must establish to support its youth, nor does it provide that monetary payments to residents are required to support youth. In operating the Children and Youth Fund, the Mayor and City Council are explicitly tasked with developing the "methods and criteria for identifying specific programs and services eligible for funding," "allocating available funds among eligible programs and services," and "establish[ing] [] any other legislative or administrative, rules, regulations, or standards" that advance the objectives of the Children and Youth Fund. Art. I, §§ 13(e)(1)-(3) of the Charter of Balt. City. Under these provisions, the Children and Youth Fund may be used to support a broad range of initiatives, so long as they "ensure that Baltimore's children and youth are healthy," "support[] families," "strengthen community-based networks of recreation," and prioritize "children and youth with the highest needs." Id. at §§ 13(a)(2)(i)-(vi).

The same flexibility is not provided by the Baby Bonus Amendment, which

promulgates one solution for addressing childhood poverty—cash payments of $1,000 or more to parents of newborns. See Proposed Art. I, § 20(a)(6) of the Charter of Balt. City. As the circuit court aptly noted, the Baby Bonus Amendment is "devoid of any provisions directed to the configuration of Baltimore City government." For example, it does not establish a commission tasked with identifying solutions aimed at addressing childhood poverty or identify any potential means for mitigating childhood poverty other than the required cash payments. And, it does not permit the City to utilize the Baby Bonus Fund to assist City residents who do not qualify as "the birthing parent," adopting parent, or guardian of a newborn child, even if such assistance would help reduce instances of childhood poverty. Proposed Art. I, § 20 of the Charter of Balt. City.[22]

Although the Baby Bonus Amendment affords the City the discretion to establish the "methods and criteria for evaluating parental eligibility[,]" "the logistic[s] [for] distribution of the Fund[,]" and "any other legislative or administrative rules, regulations, or standards" that advance the objectives of the Baby Bonus Amendment, these provisions

---

[22]To be sure, the revenue sources provisions, i.e., funding provisions, for the Children and Youth Fund and the Baby Bonus Fund are identical and provide that the respective Funds are comprised of: "1. a mandatory annual appropriation in the Ordinance of Estimates of an amount equal to at least $0.03 on every $100 of assessed or assessable value of all property in the City of Baltimore (except property exempt by law); and 2. Grants and donations made to the Fund." Art. I, § 13(c) of the Charter of Balt. City (paragraph breaks omitted); Proposed Art. I, § 20(b) of the Charter of Balt. City (paragraph breaks omitted). The source of funding, though, is not dispositive as to whether the Baby Bonus Amendment is proper charter material. The proposed Baby Bonus Amendment leaves the City responsible for making only a narrow range of procedural decisions concerning mandatory minimum payments that involve an exercise of the City's general welfare power. See, e.g., Atkinson I, 428 Md. at 747, 53 A.3d at 1198 (noting that "the operative standard is a question of degree, in this case, the extent to which discretion of the legislative body is precluded by the proposed Charter amendment").

essentially give the City the ability to determine only the process and manner for distributing the mandatory payments. Id. at §§ 20(d)(1)-(3). The City is without the discretion to decline to make the payments, impose conditions on the use of the funds once received, or impose conditions on who may qualify for the payments.[23] In contrast, the Children and Youth Fund affords the City with discretion to establish the very substance of any programs offered to residents. See Art. I, § 13(a)(1) of the Charter of Balt. City ("There is a continuing, non[-]lapsing Baltimore City Children and Youth Fund, to be used exclusively for purposes of *establishing* new and augmenting existing programs for and services to the children and youth of this City.") (Emphasis added)). Our precedent concerning the constitutionality of charter amendments provides that a proposed amendment cannot intrude on powers reserved to the local legislature under Article XI-A. See, e.g., Cheeks, 287 Md. at 608-09, 415 A.3d at 261-62. In this case, the proposed amendment deprives the City of any meaningful decision-making authority in an area reserved for its control under Article XI-A.

**Severance**

In Smallwood, 327 Md. at 246, 608 A.2d at 1235, we stated that "when the dominant

---

[23]The Baby Bonus Amendment provided that "[b]y Ordinance, or by proper delegation of regulatory authority, the Mayor and City Council may set forth conditions in which the guardian of a child other than the birthing parent may receive the Baby Bonus Payment instead of the birthing parent . . . [and] in which an adopting parent or parent(s) may receive a single Baby Bonus Payment upon the adoption of a child." Proposed Art. I, § 20(a)(3) and (4) of the Charter of Balt. City. This provision of the Amendment provided the Mayor and City Council with only the limited discretion of determining who qualified as a guardian or adopting parent (versus a parent) and under what conditions a guardian or adopting parent could receive the payment.

purpose of an enactment may largely be carried out notwithstanding the enactment's partial invalidity, courts will generally hold the valid portions severable and enforce them." (Quoting O.C. Taxpayers for Equal Rts., Inc. v. Mayor and City Council of Ocean City, 280 Md. 585, 601, 375 A.2d 541, 550 (1977) (brackets omitted)).  We explained that we have consistently determined that submission to the voters of a proposed charter amendment that is in conflict with public general law should be enjoined and that, if a part of a proposed charter amendment is invalid and severable, we have a duty to sever those parts when they are challenged.  See id. at 247, 608 A.2d at 1235.  We stated that "submission of an amendment with invalid and severable portions intact would mislead the public during the election by asking them to vote on an amendment which, in its present form, was incapable of becoming part of their charter."  Id. at 248, 608 A.2d at 1236.

Although the Alliance contends that the primary purpose of the Baby Bonus Amendment may be effectuated without the mandatory $1,000 payment provision and that if invalid the provision could be severed from the amendment, the plain language of the Baby Bonus Amendment does not support severability.  The dominant purpose of the Baby Bonus Amendment is to address childhood poverty in Baltimore City through mandatory payments of at least $1,000 to the birth parents, adoptive parents, or guardians of newborns.[24]   Without the $1,000 mandatory payment provision, the Baby Bonus Amendment would provide that "a timely Baby Bonus Payment shall be made" to "the birthing parent of a child, upon the birth of a child" and that "[b]y Ordinance, or by proper

---

[24]On brief, the Alliance argued that the "dominant purpose" of the Baby Bonus Amendment is to provide support to Baltimore families with new children.

- 50 -

delegation of regulatory authority, the Mayor and City Council may set forth conditions" in which a guardian of a child or an adoptive parent may receive a single baby bonus payment. Proposed Art. I, § 20(a) of the Charter of Balt. City. The Amendment would also require that "[b]y Ordinance, or by proper delegation of regulatory authority, the Mayor and City Council shall determine the annual Baby Bonus Payment amount using all relevant data, including, but not limited to: surplus monies in the fund, historical birth rates, estimated future property values, etc." Proposed Art. I, § 20(a)(7) of the Charter of Balt. City.

The $1,000 mandatory minimum payment provision is the heart of the proposed Baby Bonus Amendment. Without the mandatory payment provision, the Baby Bonus Amendment would have no practical effect, as the City would be able to enact legislation authorizing payments in any amount, no matter how small. Unlike the tax caps in Smallwood, with severance of the mandatory payment amount in this case, absent meaningful additional implementing legislation from the City Council, the amendment would have no effect on its own. The only thing that would be clear is that the City would be directed to make a one-time payment to birthing parents (and adoptive parents and guardians)—which is a circumstance that in and of itself, under our case law, is a directive akin to legislation in an area that is reserved for the Mayor and City Council under Art. XI-A instead of a charter amendment that addresses the form and structure of government. Given that the dominant purpose of the Baby Bonus Amendment would not be achieved without the invalid provision requiring at least a $1,000 mandatory payment amount and that the substance of the proposed charter amendment is not proper charter material,

- 51 -

severance is unwarranted.

**CONCLUSION**

For the reasons discussed herein, in our order of August 29, 2024, we concluded that the Baby Bonus Amendment did not concern proper "charter material," and therefore violated Md. Const., Art. XI-A, § 3. <u>Balt. City Bd. of Elections</u>, 488 Md. at 533, 322 A.3d at 78. Because the circuit court did not err in granting the City's motion for summary judgment and enjoining the defendants from placing the Baby Bonus Amendment on the ballot for the November 2024 Presidential General Election, we affirmed its August 9, 2024 order.[25]

---

[25]Similarly, the circuit court did not abuse its discretion in denying the City Board's and the Alliance's motions for summary judgment.